2011 Ark. App. 534

**Rebecca CHRISTIAN–HOLDERFIELD and James Holderfield, Appellants**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES and Minor Children, Appellees.**

**No. CA 11–201.**

Court of Appeals of Arkansas.

Sept. 14, 2011.

Rehearing Denied Oct. 26, 2011.

---

Deborah Ruth Sallings, Little Rock, for appellant.

Tabitha Baertels McNulty, Little Rock, Melissa Bristow Richardson, Jonesboro, for appellee.

RAYMOND R. ABRAMSON, Judge.

On December 3, 2010, the Carroll County Circuit Court entered an order terminating the parental rights of Rebecca Christian–Holderfield to her twins, A.G. and H.G. (DOB 11/8/2002) and another son, F.H. (DOB 3/7/2007).[1] The court also terminated the parental rights of appellant James Holderfield to F.H.[2] Both parents appeal, arguing that the evidence did not support the trial court's finding that termination of their parental rights was in the best interest of their children.

On July 2, 2006, the Department of Human Services (DHS) received notice that H.G. (then 3 years old) had been found wandering in the street alone at 5:00 a.m. wearing nothing but a t-shirt. Ms. Christian–Holderfield did not report him missing until 9:30 a.m. H.G. was returned to Ms. Christian–Holderfield after the factors contributing to his escape were identified and the problems were corrected.

On July 6, 2006, H.G. and A.G. were removed from the home after A.G. was discovered playing unsupervised in a busy street. DHS discovered that Ms. Christian–Holderfield was no longer living in the home previously inspected by authorities and, instead, was living in a van with the children. At the time A.G. was found unsupervised, the van had been parked outside Ms. Christian–Holderfield's place of employment. Ms. Christian–Holderfield had left the children in the van to be watched by her teenaged son, who had accidentally fallen asleep. At that time, the children were removed from her custody.

When the children were removed, A.G. and H.G. were found to have significant developmental delays. In fact, H.G. was so delayed that he was initially believed to have some form of autism. Both children were oppositional and displayed significant behavioral problems. Their counselor, Rachel Herrod, indicated that she believed the cause of the children's problems was environmental in nature because they were able to progress so rapidly after entering the program. Additionally, neither child had received any immunizations, nor had they been seen by a physician.

At the adjudication hearing in August 2006, Ms. Christian–Holderfield stipulated to the children's dependency-neglect and the court so found, but authorized a trial

---

1. Another child, T.C. (DOB 8/5/1989), was also removed from the home but was an adult by the time of the termination proceedings and was, therefore, not a subject of the termination order.

2. The parental rights of the putative father of A.G. and H.G., Scott Baker, were also terminated. He did not appear at the hearing and did not appeal this decision.

placement of the children in the home. Among other things, the court ordered Ms. Christian–Holderfield to take parenting classes, have drug screens, and obtain/maintain stable housing. It also ordered her to pay $10/week per child in child support. Her husband, James Holderfield, was ordered to participate in parenting classes and drug screenings and to obtain safe housing.

At a September 7, 2006 review hearing, the court placed the children in Ms. Christian–Holderfield's temporary custody, provided that she have stable housing by September 15, 2006. She did not attend the scheduled review hearing on September 21, 2006. After the children were placed with her, Ms. Christian–Holderfield moved the children to Tennessee because she lost her housing when she separated from her husband. When they were located in October 2006, the children were returned to foster care in Arkansas.

A review hearing was rescheduled for October 26, 2006. By this time, the Holderfields had reconciled, and Ms. Christian–Holderfield was pregnant with F.H. The court, in part, ordered the children to participate in counseling at the Ozark Guidance Center and ordered the parents to remain drug free. In subsequent review hearings in January and March 2007, the court ordered the Holderfields to participate in parenting classes and counseling and to obtain and maintain stable employment, housing, and transportation. In June 2007, the court granted a thirty-day trial placement in the home, which was extended in August 2007.

In September 2007, however, Ms. Christian–Holderfield tested positive for methamphetamine and THC. When notified that she had tested positive for drugs, the Holderfields absconded with the children. F.H. was adjudicated dependent-neglected in October 2007. The Holderfields were eventually located in Tennessee in April 2009 and returned to Arkansas. Despite these events, the trial court continued to make reunification the goal. The children were placed in foster care with unsupervised visitation allowed. Those visits were halted, however, when DHS received an anonymous tip that the parents were not feeding the children properly. Although the allegations were found to be unsubstantiated, the remaining visits were supervised.

At the time of their return in April 2009, A.G. and H.G. were healthy and relatively well behaved. However, the Holderfields had not obtained any medical or dental care for the children during their absence, despite knowing that the children had dental issues. Additionally, F.H. showed some signs of developmental delay. The children continued to progress during foster care; however, there were significant instances of regression (bed-wetting, nightmares, oppositional behavior) after returning from visitation with their parents.

In the April 2010 permanency-planning hearing, the goal was changed from reunification to termination of parental rights and adoption when the court found that the parents had made only minimal efforts to comply with the case plan and court orders.

DHS filed a petition to terminate the Holderfields' parental rights on May 23, 2010. A hearing on the petition was held on July 29, 2010. At the end of the proceeding, the trial court took the matter under advisement, holding its termination order in abeyance to give the parents another ninety days to comply fully with the case plan. The court ordered the Holderfields to complete all prior orders of the court, including participation in counseling and maintaining suitable employment and transportation. The court also granted

unsupervised weekend visits with the children. Once again, those visits were stopped after DHS reported that the children exhibited significant behavioral problems after the visits.

A review hearing was held on November 4, 2010. At the end of the hearing, the trial court granted the petition terminating the Holderfields' parental rights. While the court found that the parents had failed to comply with both the letter and the spirit of the court's orders, the court stated that its real concern was that, based upon the re-emergence of certain behavioral problems since the reinstitution of visitation with the parents, reunification was not in the best interests of the children. Appellants filed a timely notice of appeal from this order.

The Holderfields' only argument on appeal is a challenge to the trial court's best-interest finding. They argue that, while the children had experienced a tremendous amount of disruption and instability in their young lives, the experience of going back and forth between the foster home and visitation was a major factor in their anxiety and acting-out behavior. Thus, not all the disruption felt by the children was caused by the appellants. Rather, much of this anxiety could be attributed to the back-and-forth nature of visitation in general and also by the interruption of visitation by unfounded reports of abuse and neglect, leaving the children unsure of when and if they would see their parents again. Additionally, the Holderfields contend that these interruptions denied them the opportunity to demonstrate their ability to properly raise their children. They note that, upon return of the children from Tennessee in 2009, the children were deemed to be healthy and relatively well behaved. They claim that, since this progress was made while the children were under their sole control without the back-and-forth stressors of visitation, they have shown that they can be good parents and that the best interests of the children could be served by placement with them. Any issues with the children's behavior could be resolved with therapy.

Furthermore, although they admit they are not perfect parents, the Holderfields submit they were not bad parents either. They submit that the fact that they do not fully subscribe to the type of child-rearing practices that DHS believed to be necessary for the children—they were described as passive, lenient, and permissive—in no way means that they cannot provide adequately for the children. There was no evidence that permissive or lenient parents are harmful parents.

Finally, while the Holderfields recognize that last-minute compliance will not automatically preclude a termination, termination is not always required in those circumstances. Here, the parents complied with the trial court's orders, albeit belatedly, and contend that there is no clear and convincing evidence that there is any potential harm in returning the children to them. Thus, they argue that the order terminating their parental rights should be reversed.

■■■ We review cases involving the termination of parental rights de novo. *Welch v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 798, 378 S.W.3d 290. The grounds for termination must be proven by clear and convincing evidence. *Id.* When the burden of proving a disputed fact is by clear and convincing evidence, the question on appeal is whether the circuit court's finding that the disputed fact was proven by clear and convincing evidence is clearly erroneous, giving due regard to the opportunity of the circuit court to judge the credibility of the witnesses. *Id.*

The termination of parental rights is a two-step process that requires the circuit court to find that the parent is unfit and that termination is in the best interest of the child. *Id.* The first step requires proof of one or more of the statutory grounds for termination. Ark.Code Ann. § 9–27–341(b)(3)(B) (Repl.2009). The second step requires consideration of whether the termination of parental rights is in the child's best interest. Ark.Code Ann. § 9–27–341(b)(3)(A) (Repl.2009). This includes consideration of the likelihood that the juvenile will be adopted and the potential harm caused by returning custody of the child to the parent. *Id.* The court, however, does not have to determine that every factor considered be established by clear and convincing evidence. *Welch, supra.* Instead, after considering all of the factors, the evidence must be clear and convincing that the termination is in the best interest of the child. *Id.*

Because the Holderfields have not challenged the court's termination decision as to the grounds for termination, we need not address those findings. *Welch, supra.* Rather, the only issue before this court is whether there was sufficient evidence that termination was in the best interest of the children.

The appellants are correct in their assertion that there must be clear and convincing evidence that termination is in the children's best interest. *Carroll v. Ark. Dep't of Human Servs.,* 85 Ark.App. 255, 148 S.W.3d 780 (2004). In determining the best interest of the children, the court should consider factors such as the likelihood of adoption and the potential harm to the health and safety of a child if subjected to continuing contact with the parent. Ark. Code Ann. § 9–27–341(b)(3)(A)(i), (ii) (Repl.2009). Parental rights will not be enforced to the detriment of the health and well being of the child. The trial court's finding in this regard was not in error.

Here, there was evidence that, while the Holderfields did obtain employment right before the termination hearing, Ms. Christian–Holderfield's employment was minimal at best and Mr. Holderfield's employment was admittedly sporadic and seasonal. There was further evidence that, while they were ordered to obtain and maintain suitable transportation, at the time of the review hearing on termination, their only vehicle was nonfunctioning and they were having to rely on a loaner vehicle from a friend. There was further evidence that, while the children were under the supervision of the foster parents, their behavior improved, but that when they were under the supervision of the Holderfields, they suffered significant regression. Even though the children appeared healthy and relatively well behaved after their return to Arkansas in 2009, F.H. was somewhat developmentally delayed and none of the children had received medical or dental care during their absence—even though Ms. Christian–Holderfield admitted that dental care was definitely needed. Finally, while the Holderfields may have been attempting to comply with the case plans and were showing improvement, these attempts came too little, too late. The children, especially the older ones, needed stability, and the parents simply did not show that they could consistently provide it. At this point, more than four years after H.G. and A.G. were removed from the home, it was not error for the trial court to find that the only way to ensure they obtained stability was to remove them from the home.

We further note that, contrary to the Holderfields' assertions that they were penalized for not sharing DHS's philosophy of parenting or because of their alternative lifestyle, the trial court stated at the ter-

mination hearing that it was not taking their unconventional lifestyle into consideration, and that such evidence was not relevant to whether they were good parents.

On the record before us, we cannot say that the trial court clearly erred in finding that termination of the Holderfields' parental rights was in the children's best interest.

Affirmed.

ROBBINS and GRUBER, JJ., agree.